IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MAURICIO RICARDO QUESADA AVENDANO,

       Petitioner,

vs.                                    No. CIV 11-0556 JB/CG

KATHRYN ELIZABETH STONER SMITH,

       Respondent.

**MEMORANDUM OPINION, FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Verified Petition for Return of Children to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent, filed June 23, 2011 (Doc. 2); and (ii) the Defendant's Motion to Dismiss Verified Petition for Return of Children to Petitioner Because the Hague Convention is Not Applicable and Custody Litigation is in the United States, Third Judicial District Court County of Dona Ana, State of New Mexico, filed July 7, 2011 (Doc. 11).  The Court held evidentiary hearings on July 11, 2011, and on August 2, 2011, in Las Cruces, New Mexico.  The primary issues are: (i) whether the Court should file an order directing that the names of Petitioner Mauricio Ricardo Quesada Avendano and Respondent Kathryn Elizabeth Stoner Smith's children be entered into the national police computer system ("N.C.I.C.") missing person section; (ii) whether the Court should issue an order directing that the children, together with K. Stoner, be brought into the Court by any United States Marshal, federal officer, or police officer; (iii) whether the Court should enter an order commanding K. Stoner to appear in the Court with the children to show cause why the Court should not order the children returned to Mexico; (iv) whether the Court should issue an immediate order prohibiting the removal

of the children from the Court's jurisdiction; (v) whether Quesada has successfully established that the children were wrongfully removed or retained; (vi) whether K. Stoner has proved that one of the exceptions in the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 ("the Hague Convention") applies; (vii) whether the Court should order return of the children to Mexico, because Quesada has established by a preponderance of the evidence that the children were wrongfully removed or retained, and because none of the exceptions in the Hague Convention apply; and (viii) whether the Court should enter an order directing K. Stoner to pay Avendano's legal costs and fees. The Court will not enter an order directing that the children's names be entered into N.C.I.C. Such an order is no longer necessary, because K. Stoner has appeared before the Court with the children. The Court has entered an order directing the United States Marshal to serve K. Stoner with an order directing her to come before the Court. The Court has also entered an order directing K. Stoner to appear before the Court to show cause why the Court should not order the children's return to Mexico. Because K. Stoner has represented that she will comply with the Court's orders and will not hide the children or flee with the children, the Court need not issue an order prohibiting the removal of the children from the Court's jurisdiction. The Court finds that Quesada has successfully established that the children were wrongfully removed from Mexico and retained in the United States. Because none of the exceptions in the Hague Convention apply, the Court will order the return of the children to Mexico. The Court will also order K. Stoner to pay Avendano's court costs and legal fees, and the transportation costs related to the return of the children.

## **FINDINGS OF FACT**

The Court held two evidentiary hearings on Quesada's petition and K. Stoner's motion to dismiss. The parties treated the hearings as trials. See Petitioner's Trial Brief, filed August 1, 2011

(Doc. 22); Attorney Fee Affidavit of Mary W. Rosner, Attorney for Respondent, filed August 8, 2011 (Doc. 28)(stating that she spent four hours on trial preparation, and that she spent four hours attending trial before the Court).  Moreover, neither side requested discovery.  Indeed, at the end of the second day of evidence, both sides said that they were prepared for the Court to decide the motions.  See Transcript of Hearing at 141:15-142:4 (taken August 2, 2011)(Court, English, Rosner)(stating that the parties agreed with the Court's proposal that it would, as soon as possible, issue its findings of fact and conclusions of law).

## I.     QUESADA, K. STONER, AND THEIR CHILDREN.

1.      Quesada is from Costa Rica.  See Transcript of Hearing at 6:20-21 (taken July 11, 2011)(K. Stoner)("July 11, 2011 Tr.").[1]

2.      K. Stoner was born in the United States.  See id. at 74:23-24 (K. Stoner); Transcript of Hearing at 6:2-7 (taken Aug. 2, 2011)(K. Stoner)("Aug. 2, 2011 Tr.").

3.      Both Quesada and K. Stoner have Ph.D.'s in biology.  See July 11, 2011 Tr. at 40:14-16 (Rosner, K. Stoner).

4.      Quesada and K. Stoner were married on June 5, 1993 in State College, Pennsylvania. See Mexican Petition for Divorce at 1 (Petitioner's Ex. 1).

5.      Quesada and K. Stoner moved to Mexico together in 1998.  See July 11, 2011 Tr. at 13:8-10 (English, Quesada); id. at 40:17-18 (Rosner, K. Stoner).

6.      Both Quesada and K. Stoner have held permanent positions as professors at the National Autonomous University of Mexico since 1998; K. Stoner no longer holds her position at the National Autonomous University of Mexico.  See id. at 13:14-17 (English, Quesada); id. at

---

[1] The Court's citations to the transcripts are to the Court Reporter's original, unedited versions.  Any final versions may have slightly different line and/or page numbers.

40:19-24 (Rosner, K. Stoner).

7.      Quesada and K. Stoner are the parents of two minor children: (i) Alejandra Quesada Stoner, born September 29, 2000, in Puerto Vallarta, Jalisco, Mexico; and (ii) Victoria Quesada Stoner, born November 16, 2004, in Morelia, Michocan, Mexico.  See id. at 13:21-14:2 (English, Quesada); Victoria Quesada Stoner's Acta de Nacimiento (Petitioner's Ex. 5); Alejandra Quesada Stoner's Acta de Nacimiento (Petitioner's Ex. 5).

8.      A. Stoner and V. Stoner are American citizens born in a foreign country; Quesada and K. Stoner thought it would be good for them to have dual citizenship.  See July 11, 2011 Tr. at 16:10-17 (English, Quesada)("[B]ecause they were born in Mexico . . . they're Mexican citizens, and then we . . . decided that it would be good for both of them to have the U.S. citizen[ship] and so we went to the U.S. embassy . . . and signed the papers for them to become citizens of the U.S., as well."); Aug. 2, 2011 Tr. at 14:2-18 (Rosner, K. Stoner)("We always planned for them to have U.S. citizen[ship].  And Mexican.").

9.      A. Stoner is now ten years old, and V. Stoner is six years old.  See July 11, 2011 Tr. at 13:21-14:2 (English, Quesada); id. at 52:25-53:4 (Rosner, K. Stoner).

10.     A Stoner will be sixteen years old on September 29, 2016, and V. Stoner will be sixteen on November 16, 2020.  See id. at 13:21-14:2 (English, Quesada).

11.     A. Stoner and V. Stoner are fluent in English.[2]  See Aug. 2, 2011 Tr. at 6:8-10 (Rosner, Stoner).

---

[2] Quesada testified that the children's first language is Spanish.  See Aug. 2, 2011 Tr. at 125:13-17 (Rosner, Quesada).  K. Stoner testified that the children's first language is English. See Aug. 2, 2011 Tr. at 6:8-9 (Rosner, K. Stoner)("Q.  What is the first language of your children? A. English.").  The parties offer conflicting testimony regarding the children's first language, but the parties do not dispute that A. Stoner and V. Stoner speak English.  See Aug. 2, 2011 Tr. at 6:8-10 (Rosner, K. Stoner).  The Court will thus find only that the children speak English.

12.     A Stoner speaks Spanish.  See id. at 125:13-17 (Rosner, Quesada).

13.     Before V. Stoner left Mexico in July 2010, she too spoke Spanish.  See id. at 125:15-23 (Rosner, Quesada).

14.     V. Stoner speaks now English only.  See id. at 125:18-20 (Rosner, Quesada)(stating that it is a pity that Victoria lost her Spanish).

15.     Since their marriage and the birth of their children, Quesada and K. Stoner have maintained a home in common wherein they have carried out their parental responsibilities towards the children.  See July 11, 2011 Tr. at 13:8-10, 15:21-16:8 (English, Quesada); id. at 40:17-18, 54:1-16 (Rosner, K. Stoner); Aug. 2, 2011 Tr. at 75:9-78:21 (English, Quesada).

16.     In the last five years, A. Stoner and V. Stoner have lived with Quesada and K. Stoner at the family's home at Calle de las Vientas 120, Fraccionamianto Country Club Campestra La Huerta, Morelia, Michoacan, Mexico.  See July 11, 2011 Tr. at 15:21-16:8 (English, Quesada); Mexican Petition for Divorce at 1.

17.     Quesada is still paying a mortgage on the house.  See July 11, 2011 Tr. at 15:25-16:2 (Quesada)("We purchased this house in 2006, and we actually took a loan.  It not ours still.  It's the bank's.  And but we . . . moved into this house in 2006.").

18.     Quesada has lived with his children all of their lives.  See July 11, 2011 Tr. at 16:20-21 (Quesada).

19.     Both Quesada and K. Stoner have provided the children with food, shelter, and education.  See July 11, 2011 Tr. at 16:20-24 (Quesada).

20.     K. Stoner has a close relationship with A. Stoner and V. Stoner.  See July 11, 2011 Tr. at 54:1 (K. Stoner)(stating that her relationship with her daughters is "very close").

21.     Both parents participated in the children's lives, but K. Stoner spent more time with

the children than Quesada.[3]  See Aug. 2, 2011 Tr. at 76:4-5, 78:16 (Quesada); July 11, 2011 Tr. at

16:20-24 (Quesada); Aug. 2, 2011 Tr. at 8:23-9:6 (K. Stoner).

22.     Quesada was gone out of the home because of his profession from: (i) August 1, 2008

through September 26, 2008; (ii) October 28, 2008 through November 28, 2008; (iii) February 21,

2009 through March 9, 2009; (iv) May 11, 2009 through May 24, 2009; (v) July 9, 2009 through

July 18, 2009; and (vi) August 1, 2009 through September 21, 2009.  See July 11, 2011 Tr. at 62:13-

24 (Rosner, K. Stoner); id. at 27:3-13 (English, Quesada)(stating that, before July 13, 2010, Quesada

was away from home because of research and teaching responsibilities, and that, during that time,

he was generally absent between a week to three weeks).

23.     A. Stoner and V. Stoner have grandparents, aunts, uncles, and friends in the United

States.  See July 11, 2011 Tr. at 68:12-14 (K. Stoner); Aug. 2, 2011 Tr. at 6:11-16 (Rosner, K.

Stoner)(stating that the children's maternal grandparents, their cousins, and their grand aunt and

uncle live in the United States).

24.     Most of Quesada's family live in Costa Rica.  See Aug. 2, 2011 Tr. at 6:17-21

(Rosner, K. Stoner).

25.     The children do not have any relatives in Mexico other than their father.  See Aug.

---

[3] K. Stoner asserts that she is the parent who primarily raised the children and that Quesada
was merely an occasional participant in child-rearing.  See Aug. 2, 2011 Tr. at 8:23-9:6 (K.
Stoner)(stating that Quesada has been an occasional participant in child-rearing, when it was
convenient for him, and that he has never done primary care).  Quesada asserts that he was more
than a mere occasional participant, stating: "I still have custody rights.  I am their father and I have
lived with them all their lives.  I have provided for them, you know, both food and shelter and
education, and I have -- and I have been with them and have, you know . . . s[ince] they were both
born."  July 11, 2011 Tr. at 16:20-24 (Quesada).  He asserts that both he and Kathy participated in
the children's care and that he participated actively in the children's lives.  See Aug. 2, 2011 Tr. at
76:4-5, 78:16 (Quesada).  Both parents were busy professionals.  Although the Court credits K.
Stoner's testimony that she spent more time with the children than Quesada, the Court also credits
Quesada's testimony that both he and K. Stoner participated in the children's lives.

2, 2011 Tr. at 6:17-21 (Rosner, K. Stoner).

26.     Before K. Stoner took the children to the United States, the children went to school in Mexico, and were settled and integrated in Mexico's life and culture.  See Tr. at 14:5-9 (English, Quesada)("Q. Where have your children lived during their lifetime?  A. They have lived in Mexico their life . . . and they both went to school in [Michoacan]."); id. at 25:25-26:4 (Quesada)("They already have a school, they have friends in Mexico, many friends, in fact, and their teachers are expecting them to come back."); Pediatrician Record for V. Stoner at 1 (Petitioner's Ex. 6); Pediatrician Record for A. Stoner at 1 (Petitioner's Ex. 6); School Record for A. Stoner at 1 (Petitioner's Ex. 6); School Record for V. Stoner at 1 Petitioner's Ex. 6).

27.     From August 2008 through August 2009, A. Stoner and V. Stoner lived in Los Angeles, California, and attended school while K. Stoner was on sabbatical.  See A. Stoner's Report Card at 1 (Respondent's Ex. D); V. Stoner's Preschool Diploma at 1 (Respondent's Ex. D); Aug. 2, 2011 Tr. at 35:15 (K. Stoner).  K. Stoner and the children lived in Los Angeles alone for several months until Quesada joined them.  See July 11, 2011 Tr. at 61:9-16 (Rosner, K. Stoner).

28.     A. Stoner and V. Stoner did well in Los Angeles during the academic school year. See A. Stoner's Report Card at 1 (Respondent's Ex. D); V. Stoner's Preschool Diploma at 1 (Respondent's Ex. D); July 11, 2011 Tr. at 15:8-14 (Quesada).

29.     Quesada's personality has changed over the past ten years, and his personality has become worse lately when he is intoxicated.  See Aug. 2, 2011 Tr. at 18:8-13 (K. Stoner).

30.     Quesada has consumed alcohol to excess at times when he was not working, but when he was with the family.[4]  See id. at 9:9-11 (Rosner, K. Stoner); July 11, 2011 Tr. at 47:23-

_____

[4] Quesada states that he does not drink in excess; he admits, however, that he drinks at parties and get togethers.  See Aug. 2, 2011 Tr. at 78:22-79:13 (Quesada).  K. Stoner testified that Quesada

48:15 (Rosner, K. Stoner); <u>id.</u> at 50:2-5 (K. Stoner)("I think he is my opinions he's a social alcoholic. He doesn't . . . get the shakes. He's . . . responsible . . . at his work . . . ."); Aug. 2, 2011 Tr. at 9:18-10:2 (Rosner, K. Stoner)(stating that Quesada parties every weekend); Aug. 2, 2011 Tr. at 78:22-79:13 (Quesada)(stating that he drinks at parties on the weekend, but not every weekend).

31.    The alcohol was neither a habit nor extreme, but was a concern.[5]  <u>See</u> Aug. 2, 2011 Tr. at 9:18-10:2 (Rosner, K. Stoner)(stating that Quesada "pretty much parties every weekend, every Friday and Saturday night" and usually has a "few people" over, with "several [bot]tles of rum"); Aug. 2, 2011 Tr. at 78:22-25 ("I'm not an alcoholic. . . .  I think in parties or get togethers [sic] you know we have some drinks.  The same way Kathy did.").

32.    Quesada has been abusive towards K. Stoner, especially when he is intoxicated.

_____

"has a few people over," that sometimes he drinks too much, and that, when he has people over, there may be "a bottle of rum per person."  Aug. 2, 2011 Tr. at 9:18-25 (Rosner, K. Stoner).  The Court credits K. Stoner's testimony that, at times, Quesada drinks to excess when he is not working.

[5] K. Stoner asserts that Quesada is an alcoholic.  <u>See</u>, <u>e.g.</u>, July 11, 2011 Tr. at 50:2 (K. Stoner); Aug. 2, 2011 Tr. at 34:1-2 (K. Stoner).  Quesada states:

> I'm not a alcoholic.  I don't drink bottles of rum.  I can certainly say that . . . .  I think in parties or get togethers [sic] you know we have some drinks.  The same way Kathy did.  And we all enjoyed many of these parties together, you know.  Not only you know the last ten years but probably in the last 20 years.  I think she doesn't mention that in all her affidavits, but we had a really good couple \life\live together you know for many years.  And so I must say that use we have many friends, we have a lot of activities, we get together with friends. . . .  I wouldn't say you know that it's every single day of the weekend that we actually do this and I certainly wouldn't say that it's every weekend.  We have get together[s] you know with friends.  I think the [Latin] American communities you know very active in getting together and seeing the family and so forth and that's that's where part of the culture, you know.  But I wouldn't say that I'm an alcoholic and I don't drink in excess, either.

Aug. 2, 2011 Tr. at 78:22-79:13 (Quesada).  The Court credits Quesada's testimony that he is not an alcoholic.  A person's alcohol consumption can, however, be a concern without reaching the level of alcoholism.  The Court thus finds that Quesada's drinking is a concern, but is not extreme.

See id. at 34:16-21 (K. Stoner); id. at 46:13-19 (K. Stoner); July 11, 2011 Tr. at 47:13-22 (Rosner, K. Stoner).

33.     Around Easter, in 2008, Quesada, K. Stoner, and the children went on a family vacation to Costa Rica with several members of Quesada's family.  See id. at 46:13-15 (K. Stoner).  Quesada, K. Stoner, the children, and Quesada's family slept in a room together.  See id. at 46:14-16 (K. Stoner).  Late one night, Quesada came back to the room intoxicated.  See id. at 46:16-17 (K. Stoner).  He grabbed K. Stoner's wrists and raped her.[6]  See id. at 46:17-18 (K. Stoner).  K. Stoner was afraid of waking the children, so she did not scream or call out.  See id. at 47:13-22 (Rosner, K. Stoner).

34.     On December 24, 2009, the family was staying at Quesada's mother's house in Costa Rica.  See id. at 47:23-48:5 (Rosner, K. Stoner).  Quesada invited several of his friends over in the afternoon.  See July 11, 2011 Tr. at 48:10-14 (K. Stoner).  His sister asked his mother why he invited his friends to a family gathering.  See July 11, 2011 Tr. at 48:16-17 (K. Stoner).  His mother told his friends that it was time to go.  See July 11, 2011 Tr. at 48:17-18 (K. Stoner).  Quesada and one of Quesada's brothers began to yell vulgarities, insulting K. Stoner and Quesada's mother.  See July 11, 2011 Tr. at 48:17-21 (K. Stoner).  Quesada and his brother then left the house.  See id. at 48:17-23 (K. Stoner).  When they came back later, they started to insult K. Stoner and Quesada's mother again.  See July 11, 2011 Tr. at 48:17-25 (K. Stoner).  K. Stoner tried to calm Quesada's brother down, and Quesada told her "shut up bitch" and hit her.  See July 11, 2011 Tr. at 49:1-8 (K. Stoner).  K. Stoner took the children and her niece, went in the bedroom, and locked the door.  See id. at 49:6-

---

[6] At the hearings, Quesada did not address K. Stoner's allegation that he raped her.  Quesada testified, however, that he does not "recall any incidents of . . . any physical altercations with Ms. Dr. Stoner."  Aug. 2, 2011 Tr. at 74:5-7 (English, Quesada).  The Court credits K. Stoner's testimony on this issue.

10 (Rosner, K. Stoner).

35.     The domestic violence was serious and regrettable, but the most serious event -- the rape in 2008 -- does not appear to have been repeated and was not directed toward the children.[7] See July 11, 2011 Tr. at 50:19-21 (K. Stoner)("In addition to specific events of where he has actually struck or [tried] to strike me which has happened on many [occasions] I live with daily verbal abuse.").

36.     Quesada verbally abused K. Stoner often, and they heatedly argued.[8]  See July 11, 2011 Tr. at 50:19-21 (K. Stoner); Aug. 2, 2011 Tr. at 74:13-17 (English, Quesada).

37.     Quesada has never harmed his children.  See July 11, 2011 Tr. at 26:5-6 (English, Quesada).

## II.     K. STONER'S ALLEGED WRONGFUL REMOVAL AND WRONGFUL RETENTION.

38.     Divorce negotiations began in about February 2010 -- five months before K. Stoner left Mexico on July 13, 2010.  See July 11, 2011 Tr. at 14:16-15:4 (English, Quesada); July 11, 2011 Tr. at 41:15-24 (Rosner, K. Stoner).

39.     One of the main issues of disagreement in the divorce negotiations was custody of the children; K. Stoner "essentially wanted [their] daughters all the time."  July 11, 2011 Tr. at

---

[7] Quesada testified that he does not "recall any incidents of . . . any physical altercations with Ms. Dr. Stoner." Aug. 2, 2011 Tr. at 74:5-7 (English, Quesada).  He denies the accusations that K. Stoner makes.  See Aug. 2, 2011 Tr. at 74:18-20 (English, Quesada).  The Court credits K. Stoner's testimony that these events occurred.  Because the Court credits K. Stoner's testimony that these events occurred, the Court credits her testimony that there has been serious domestic violence.

[8] Quesada testified that there has not "ever been an occasion that [he] could properly characterize as verbal abuse of Ms. Stoner by [him]self," stating that they have had only strong discussions.  Aug. 2, 2011 Tr. at 74:13-17 (English, Quesada).  The Court credits K. Stoner's testimony that Quesada was verbally abusive, and Quesada's testimony that he and K. Stoner had heated arguments.

-10-

25:10-13 (Quesada).

40.     The divorce negotiations came to an end, because Quesada would not negotiate, because he said that he would never leave the house and that he would never let her leave, and because he told her that, if she left, he would not let her take the children.  See July 11, 2011 Tr. at 45:1-6 (Rosner, K. Stoner).

41.     Before she left Mexico with the children on July 13, 2010, K. Stoner requested a research stay from work.  See Aug. 2, 2011 Tr. at 17:1-3 (K. Stoner).

42.     Before she left Mexico, K. Stoner also filed on July 9, 2010 her affidavit of domestic violence with the Mexican Court.  See Aug. 2, 2011 Tr. at 18:14-18 (English, K. Stoner); July 11, 2011 Tr. at 54:23-55:4 (Rosner, K. Stoner)(stating that, before she left Mexico, she filed an affidavit of domestic violence with the family violence court in Mexico).

43.     K. Stoner left Mexico with A. Stoner and V. Stoner on July 13, 2010, with Quesada's permission.  See Aug. 2, 2011 Tr. at 16:13-22 (English, K. Stoner).

44.     Quesada drove K. Stoner, A. Stoner, and V. Stoner to the airport.  See id. at 16:13-22 (English, K. Stoner).

45.     The plan was that the children were going to be returned to Mexico on August 3, 2010 after their vacation at K. Stoner's parents' house in Las Cruces.  See Aug. 2, 2011 Tr. 17:16-19 (English, K. Stoner); July 11, 2011 Tr. at 14:16-15:4 (English, Quesada).  K. Stoner and the children were scheduled to return to Mexico on August 3, 2010, and the children were scheduled to start school again in Morelia on August 23, 2010.  See July 11, 2011 Tr. at 24:8-18 (Quesada); id. at 14:16-15:4 (English, Quesada).

46.     The children never came back to Mexico; K. Stoner returned to Mexico in early August when Quesada was in the United States for work, and took several household items and the

car, which she drove from Mexico to New Mexico without telling Quesada anything.  See July 11, 2011 Tr. at 19:1-20 (English, Quesada).

47.     K. Stoner admits that she deceived Quesada to get herself, and A. Stoner and V. Stoner, out of Mexico in what she thought was a legal way.  See Aug. 2, 2011 Tr. at 17:11-15 (English, K. Stoner).

48.     K. Stoner left Mexico with the children to travel to the United States and planned to allege that she was fleeing from the abusive behavior.  See July 11, 2011 Tr. at 14:10-12 (English, Quesada); Aug. 2, 2011 Tr. at 48:8-10 (K. Stoner); July 11, 2011 Tr. at 25:3-8 (English, Quesada).

49.     K. Stoner was not leaving Mexico with the children because of abusive behavior; she was leaving because she wanted custody of the children and because she was not securing the custody through divorce negotiations.

50.     K. Stoner's understanding of Mexican law is that there are exceptions to the law which allow one to leave the martial residence and that two of those exceptions are: (i) alcoholism or gambling; or (ii) fleeing from family violence.  See July 11, 2011 Tr. at 56:10-19 (Rosner, K. Stoner).

51.     Quesada did not acquiesce in K. Stoner's removal of A. Stoner and V. Stoner from his custody.  See July 11, 2011 Tr. at 25:17-20 (English, Quesada).

52.     At no time did Quesada agree to K. Stoner retaining the children in the United States. See July 11, 2011 Tr. at 25:14-21 (English, Quesada).

53.     K. Stoner asserts that, after she took A. Stoner and V. Stoner to the United States, A. Stoner and V. Stoner indicated that "they want to stay in the [United States]" and that "they like it very much."  Aug. 2, 2011 Tr. at 7:20-25 (K. Stoner).

54.     From August 2010 through May 25, 2011, A. Stoner and V. Stoner attended Mesilla

-12-

Valley Christian School in Las Cruces, where K. Stoner and the children lived until July, 2011. See id. at 125:6-9 (Rosner, Quesada); July 11, 2011 Tr. at 67:6-9 (Rosner, K. Stoner).

55.     A. Stoner and V. Stoner have now successfully completed a year of schooling at Mesilla Valley Christian School.  See Kindergarten Report Card (Respondent's Exhibit E); Alejandra Quesada-Stoner's Report Card (Respondent's Exhibit E).

56.     In the last academic school year, Fall, 2010, through Spring, 2011, A. Stoner received all A's, and V. Stoner received a number of M's for Mastery and several I's for In Progress, which is are very good report card.  See Kindergarten Report Card (Respondent's Exhibit E); Alejandra Quesada-Stoner's Report Card (Respondent's Exhibit E).

57.     The principal of Mesilla Valley Christian School wrote a letter saying that the children are model students.  See Aug. 2, 2011 Tr. at 7:6-7 (K. Stoner).

58.     The children are well acclimated to the United States, and they enjoy it.  See Aug. 2, 2011 Tr. at 6:22-7:4 (Rosner, K. Stoner).

59.     The children have many activities in the United States: they go to church regularly, they went to vacation Bible school, they participate in gymnastics and after-school activities; and the older daughter has been in a theater group.  See Aug. 2, 2011 Tr. at 6:24-7:3 (K. Stoner).

60.     During this time, Quesada has had very limited telephone contact with the children, as K. Stoner has controlled the children.[9]  See July 11, 2011 Tr. at 70:4-8 (K. Stoner)(stating that

_____

[9] K. Stoner states that Quesada has called the children only sporadically. See July 11, 2011 Tr. at 70:4-8 (K. Stoner)(stating that Quesada has called the children sporadically on and off); Aug. 2, 2011 Tr. at 11:13-15, 70:8-12 (Rosner, K. Stoner)(stating that Quesada's telephone contact is limited to once every couple of months or once every six weeks).  Quesada states that he has been trying to communicate with his children throughout the year that they were with K. Stoner in the United States, but that K. Stoner and her parents obstructed his attempts to communicate with his children.  See Aug. 2, 2011 Tr. at 82:8-83:21 (stating that "throughout all this year I've been obstructed, you know, to communicate with my children, both Kathy and her parents have not

-13-

Quesada has called the children sporadically on and off); Aug. 2, 2011 Tr. at 11:13-15, 70:8-12 (Rosner, K. Stoner)(stating that Quesada's telephone contact is limited to once every couple of months or once every six weeks); Aug. 2, 2011 Tr. at 82:8-83:21 (stating that "throughout all this year I've been obstructed, you know, to communicate with my children, both Kathy and her parents have not answered my phone calls although I have called every single weekend, in the morning, at noon, and later at night").

61.     Quesada has not sent money for child support to K. Stoner since she has been in the United States. See Aug. 2, 2011 Tr. at 14-17 (Rosner, Quesada).

62.     Quesada has not given K. Stoner money for supporting the children, except for paying the mortgage on their home, since January, 2010. See Aug. 2, 2011 Tr. at 11:1-6 (Rosner, K. Stoner).

63.     It would be more difficult for Quesada to care for the children in Mexico than for K. Stoner to care for the children in the United States, because he travels a lot for his work, and he does not have other family or extended family to help take care of the children. See Aug. 2, 2011 Tr. at 9:2-6 (K. Stoner).

64.     Quesada and K. Stoner had a housekeeper who helped take care of their children and "acted as their nanny . . . from 2006." Id. at 37:1-8 (English, K. Stoner).

65.     If the housekeeper was not available, "[the housekeeper's] mother would participate in the caretaking of the house and of the children." Id. at 37:9-12 (English, K. Stoner).

---

answered my phone calls although I have called every single weekend, in the morning, at noon, and later at night"). Both parties testified that Quesada has had limited contact with her children. The Court will thus find that Quesada has had limited contact with his children. The Court also credits, however, Quesada's testimony that K. Stoner and her parents have obstructed some of his contact with his children.

66.     The housekeeper and her mother still work for Quesada.  <u>See</u> Aug. 2, 2011 Tr. at 37:16-21 (English, K. Stoner).

67.     Morelia, where they used to live together, is a dangerous place; Morelia officials have had to frequently close the schools because of violence in the town; there have been several murders in which innocent bystanders have been killed.  <u>See</u> Aug. 2, 2011 Tr. at 10:3-11 (Rosner, K. Stoner).

68.     K. Stoner has independent means of supporting herself in Mexico.  <u>See</u> July 11, 2011 Tr. at 40:14-24 (Rosner, K. Stoner).

69.     There is a court of domestic violence in Mexico, where a spouse may get a restraining order because of domestic violence, but it takes longer to get such an order in Mexico than in the court system in the United States.  <u>See</u> Aug. 2, 2011 Tr. at 53:14-23 (Rosner, K. Stoner).

70.     K. Stoner could file a police report if Quesada committed an act of domestic violence, but the police may take several hours to appear after they are called.  <u>See</u> Aug. 2, 2011 Tr. at 53:24-54:10 (Rosner, K. Stoner).

71.     Quesada has filed criminal charges against K. Stoner in Mexico.   <u>See</u> Penal Investigation No. 278/2010 at 1.

72.     Quesada accuses K. Stoner in the Mexican criminal proceedings of theft, abduction, and kidnaping of the minor children.  <u>See</u> Penal Investigation No. 278/2010 at 12-14; Aug. 2, 2011 Tr. at 115:16-21 (Rosner, Quesada).

73.     The criminal charges, should they be successful, could subject K. Stoner to incarceration in criminal court.  <u>See</u> Aug. 2, 2011 Tr. 9:1-3 (K. Stoner); July 11, 2011 Tr. at 74:23-75:4 (K. Stoner).

74.     Quesada has indicated, however, that he intends to nullify or take back the criminal charges that he has filed.  <u>See</u> Aug. 2, 2011 Tr. at 115:22-25 (Rosner, Quesada)("Q.  Okay.  My

-15-

question to you is, have you done anything in Mexico to nullify or take back the criminal charge that you filed?  A.  I will do that as soon as we.").

75.     In September, 2010, Quesada filed a Mexican Petition Under the Hague Convention, asking the Mexico Secretary of State under the Hague Convention to contact the United States Secretary of State.  See July 11, 2011 Tr. at 22:10-23:13 (English, Quesada); Mexican Petition Under Hague Convention (Petitioner's Exhibit 4).

76.     Quesada filed a petition for divorce in Mexico in April, 2011.  See Mexican Petition for Divorce at 1 (Petitioner's Exhibit 1).

77.     In a civil suit for divorce, Quesada seeks "the loss of maternal rights of our daughters."  Mexican Petition for Divorce at 1.

78.     There is no custody order from any court that has awarded custody of the children to either parent.  See Aug. 2, 2011 Tr. at 14:22-25 (Rosner, K. Stoner).

79.     K. Stoner has filed a case seeking a divorce, child support, and child custody in Dona Ana County, State of New Mexico.  See Aug. 2, 2011 Tr. at 15:1-7 (Rosner, K. Stoner).

80.     Quesada was served with the complaint K. Stoner filed seeking a divorce, child support, and child custody on July 11, 2011.  See Aug. 2, 2011 Tr. at 15:4-7 (K. Stoner).

81.     At the end of July, 2011, K. Stoner moved from Las Cruces to Kirksville, Texas, where she obtained a position as a professor.  See July 11, 2011 Tr. at 76:20-25 (Court, K. Stoner).

82.     K. Stoner took the children with her to Kirksville; she has registered them for school. See July 11, 2011 Tr. at 77:3-4 (Court, K. Stoner).

## PROCEDURAL BACKGROUND

On June 23, 2011, Quesada filed a Verified Petition for Return of Children to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent.  See Doc. 2.  He brought the

Petition pursuant to the Hague Convention and ICARA.  Quesada stated that, other than the Mexican litigation he had initiated, he did not have any information of any custody proceeding concerning A. Stoner and V. Stoner pending in any other court of New Mexico or in any other state other than the one K. Stoner has filed in Dona Ana County.  Quesada also represents that he does not know of any person or institution not a party to the proceedings who has physical custody of the children, or are asserting rights of parental responsibilities or legal custody or physical custody of, or visitation with, A. Stoner and V. Stoner.  Quesada declares and affirms under penalty of perjury and the laws of the United States, that the contents of his petition are true to the best of his knowledge, information, and belief.  Quesada asks that the Court issue an order directing that the name of the children be entered into the N.C.I.C.'s missing person section.  He asks the Court to enter an order directing a prompt return of the children to Mexico.  He further asks the Court to enter an order directing that the Marshals bring the children and K. Stoner into the Court.  He asks the Court to enter an order prohibiting the removal of the children from the jurisdiction of the Court.  He also asks the Court to enter an order commanding K. Stoner to appear in Court with the children to show cause why the children have been kept from him.  Finally, Quesada asks the Court to enter an order directing K. Stoner to pay his legal costs and fees.

On July 1, 2011, the Court entered an Order to Show Cause.  See Doc. 4.  The Court ordered K. Stoner to appear before the Court with the children at a hearing, to show cause why the children should not be returned to Mexico, and to tell the Court why the other relief requested in the Petition should not be granted.  Also on July 1, 2011, the Court entered an Order Directing that Respondent Come Before the Court With Minor Children.  See Doc. 5.  The Court ordered K. Stoner and the children to come before the Court for a hearing and directed the United States Marshals Service to serve K. Stoner with the Court's order.

On July 11, 2011, K. Stoner filed her Motion to Dismiss Verified Petition for Return of Children to Petitioner Because the Hague Convention is not Applicable and Custody Litigation is in the United States, Third Judicial District Court County of Dona Ana, State of New Mexico. See Doc. 11.   K. Stoner states that the Court should dismiss the Petition, because the Hague Convention is not applicable when applied to the facts of this case.

Quesada and K. Stoner testified at the July 11, 2011 hearing.   Neither child testified at the hearing, but were present outside of the courtroom. At the hearing on July 11, 2011, the Court asked K. Stoner whether she was "going to remain subject to the jurisdiction of the Court?" July 11, 2011 Tr. at 76:14-15 (Court).   K. Stoner replied: "Oh yeah." July 11, 2011 Tr. at 76:16 (K. Stoner).

THE COURT:  And if I set another hearing you'll be available for it?

[K. STONER:]  I hope the sooner the better.

THE COURT:  You'll bring the children here and things[?]

[K. STONER:]  yes.

THE COURT:  A[nd] where are [you residing?]

[K. STONER:]  I'm residing right here in Las Cruces New Mexico but I have a new job in Texas that starts . . . the end of July.  But I'll be com[ing] back and for[th].

THE COURT:  Kirksville is down by Corpus Christi.

[K. STONER:] . . . [Y]es.

THE COURT:  Are the children going to stay here[?]

[K. STONER:] . . . [N]o they'll go with me I have registered [them] for school there.

THE COURT:  But if I

[K. STONER:] . . . I will make myself available.  My parents live in town and that works out really well.

THE COURT:  Let me ask you[,] as I think about this case . . . if I make rulings

against you you're going to obey the Court's orders and do what the Court tells you to do you're not

[K. STONER:] . . . [O]f course.

THE COURT:  Not try to hide the children or flee or anything like . . .

[K. STONER:] . . .  I'm a biology professor I can't f[l]ee or hide myself.

THE COURT:  You're not

[K. STONER:] . . . I never have . . . .  I never have.

July 11, 2011 Tr. at 76:16-77:19 (Court, K. Stoner).

On July 27, 2011, K. Stoner filed the Respondent's Brief in Support of Her Motion to Dismiss.  See Doc. 16.  K. Stoner argues that Quesada cannot establish a prima-facie case for return.  She argues that the United States, not Mexico, is the habitual residence of the parties' children.  She argues that the removal or retention was not wrongful, and that Quesada's custody rights were not breached.  She also asserts the affirmative defenses in Articles 12, 13, and 20 of the Hague Convention -- the well-settled defense, consent or acquiescence to the removal or retention, the grave-risk defense, the mature child objection to removal defense, and the public-policy defense.

At the hearing on August 2, 2011, again both Quesada and K. Stoner testified.  They did not present any other witnesses.  Again, the children were present outside of the courtroom, but did not testify.  K. Stoner wanted the Court to hear from A. Stoner and V. Stoner in chambers, but Quesada was opposed to such a procedure.  Neither parent wanted the children to testify.  At the end of the hearing, the Court confirmed that they had no other evidence to present and that they were ready for the Court to rule:

THE COURT:  . . .  What I would propose to do is send you findings of fact and conclusions of law as soon as I can get them out and I [intend] to go back to Albuquerque and work on them immediately.  Is that an acceptable approach Mr. English?

-19-

MR. ENGLISH: Absolutely.

THE COURT: Ms. Rosner.

MS. ROSNER: Yes, sir.

Aug. 2, 2011 Tr. at 141:15-22 (Court, English, Rosner).

Both parties filed numerous exhibits with the Court; Quesada attached his exhibits to his Petition, and K. Stoner attached her exhibits to her Brief in Support of Motion to Dismiss.  Quesada also submitted affidavits.  Many of these exhibits and affidavits, however, were not admitted into evidence during the evidentiary hearings that both parties treated as trials.  The Court relied only upon the exhibits that were fully admissible at the hearing.  See Memorandum Opinion and Order, filed August 1, 2011 (Doc. 23)("The Court . . . concludes that the Federal Rules of Evidence apply to its consideration of the Petition.").

## CONCLUSIONS OF LAW

### I.    THE HAGUE CONVENTION.

1.    The Hague Convention "seeks to deter parents who are dissatisfied with current custodial arrangements from abducting their children and seeking a more favorable custodial ruling in another country." Navani v. Shahani, 496 F.3d 1121, 1124 (10th Cir. 2007)(citing Shealy v. Shealy, 295 F.3d 1117, 1121 (10th Cir. 2002)).  The Hague Convention "creates an international legal mechanism requiring contracting states to promptly return children who have been wrongfully removed to, or wrongfully retained in, their jurisdiction, without deciding anew the issue of custody." Navani v. Shahani, 496 F.3d at 1124 (citing de Silva v. Pitts, 481 F.3d 1279, 1282 (10th Cir. 2007)).  The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 through 11610 ("ICARA"), implements the Hague Convention, and grants federal and state courts "concurrent original jurisdiction of actions arising under the Convention."  42 U.S.C. § 11603(a).

2.      The Hague Convention states:

The removal or the retention of a child is to be considered wrongful where --

*a)* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

*b)* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph *a)* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention art. 3.

3.      A petitioner who seeks an order returning a child to his country of habitual residence must show: "(1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's custody rights under the laws of that state; and (3) petitioner was exercising those rights at the time of removal or retention." Shealy v. Shealy, 295 F.3d at 1122. "A petitioner in an action . . . shall establish by a preponderance of the evidence -- . . . in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1).

4.      Neither the Hague Convention nor ICARA define the term "habitual residence." Kanth v. Kanth, No. 99-4246, 232 F.3d 901, at *1 (10th Cir. Nov. 2, 2000)(table)(citation omitted). "Rather a child's habitual residence is defined by examining specific facts and circumstances and is a term courts should not interpret technically or restrictively." Kanth v. Kanth, 232 F.3d 901, at *1 (citing Zuker v. Andrews, 2 F.Supp.2d 134, 136-37 (D. Mass. 1998), aff'd, 181 F.3d 81 (1st Cir. 1999)(table); Harkness v. Harkness, 577 N.W.2d 116, 121 (Mich. Ct. App. 1998)(stating that "determination of 'habitual residence' depends largely on the facts of the particular case")). In the

case of a young child, "the conduct, intentions, and agreements of the parents during the time preceding the abduction are important factors to be considered." Kanth v. Kanth, 232 F.3d 901, at *1 (citing Feder v. Evans-Feder, 63 F.3d 217, 223 (3d Cir. 1995); Pesin v. Osorio Rodriguez, 77 F. Supp. 2d 1277, 1285 (S.D. Fla. 1999)(stating that court would focus on parents' actions and shared intentions where children were four and six at time of alleged wrongful retention)).  In addition:

> [T]here must be a degree of settled purpose.  The purpose may be one or there may be several.  It may be specific or general.  All that the law requires is that there is a settled purpose.  That is not to say that the propositus intends to stay where he is indefinitely.   Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others.  All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

Kanth v. Kanth, 232 F.3d 901, at *1 (quoting Feder v. Evans-Feder, 63 F.3d at 223).

5.    The Hague Convention defines "rights of custody" as including "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention art. 5.  Rights of custody are different from "rights of access," which the Hague Convention defines as including "the right to take a child for a limited period of time to a place other than the child's habitual residence."   Hague Convention art. 5.  "The rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Hague Convention art. 3.  "The Convention provides a return remedy when a parent takes a child across international borders in violation of a right of custody; [it] provides no return remedy when a parent removes a child in violation of a right of access . . . ."  Abbott v. Abbott, 130 S. Ct. 1983, 1991 (2010).

6.    "Courts charged with deciding 'exercise' under the Convention must not cross the

line into a consideration of the underlying custody dispute.  To avoid this possibility, American courts have interpreted 'exercise' broadly." Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 344 (5th Cir. 2004)(citing Friedrich v. Friedrich, 78 F.3d 1060, 1063 (6th Cir. 1996); Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603 (E.D. Va. 2002); Freier v. Freier, 969 F. Supp. 436 (E.D. Mich. 1996); Sampson v. Sampson, 267 Kan. 175, 975 P.2d 1211 (1999)).  The United States Court of Appeals for the Sixth Circuit has stated "that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."  Friedrich v. Friedrich, 78 F.3d at 1066.  See Navani v. Shahani, 496 F.3d at 1130 ("Finally, the Sixth Circuit in Friedrich articulated its test for when a custodial parent exercises custody rights under the Hague Convention: a custodial parent exercises custody rights unless the parent's actions 'constitute clear and unequivocal abandonment of the child.'" (citation omitted)); Sealed Appellant v. Sealed Appellee, 394 F.3d at 345 ("[W]hen a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights.  To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child.").  Courts have found that occasional visitation and contribution to a child's financial support constitutes exercising custody rights.  See Whallon v. Lynn, 230 F.3d 450, 453, 459 (1st Cir. 2000)(finding that rights of custody exercised where respondent spent two weekends a month with child, lived near her, provided some financial support, drove her to school, bought her clothes, took her to the doctor, helped her with homework); Sealed Appellant v. Sealed Appellee, 394 F.3d at 345 ("Father did not abandon his children.  By visiting his children and contributing to their financial support, Father was exercising his custody rights at the time Mother removed the children from their country of habitual residence.")(emphasis in original); Armiliato

v. Zaric-Armiliato, 169 F. Supp. 2d 230, 240 (S.D.N.Y. 2001)(addressing "Ms. Zaric-Armiliato['s]

claims that Mr. Armiliato was not exercising his custody rights at the time of the removal because

she was Alessandra's primary care-taker," and finding that, although the child resided primarily with

her mother, "Mr. Armiliato provided the sole means of financial support for Alessandra," that,

"[a]fter the separation, he was in constant contact with Alessandra and visited her regularly," and

that, "immediately prior to the removal, Mr. Armiliato spent the weekend caring for Alessandra at

his parents home," and thus finding that "Mr. Armiliato was exercising his rights of custody at the

time of the removal").

       7.     If the petitioner establishes wrongful removal or retention, "the authority concerned

shall order the return of the child."  Hague Convention art. 12.  The Hague Convention, however

"provides for several exceptions to return if the person opposing return can show any of the

following": (i) "the person requesting return was not, at the time of the retention or removal, actually

exercising custody rights or had consented to or subsequently acquiesced in the removal or

retention;" (ii) "the return of the child would result in grave risk of physical or psychological harm

to the child"; (iii) "the return of the child would not be permitted by the fundamental principles of

the requested State relating to the protection of human rights and fundamental freedoms"; or (iv)

"the proceeding was commenced more than one year after the abduction and the child has become

settled in the new environment." Ohlander v. Larson, 114 F.3d 1531, 1534 (10th Cir. 1997)(internal

quotation marks and citations omitted).  Courts should narrowly construe the statutory exceptions,

because "[t]he Convention establishes a strong presumption favoring return of a wrongfully removed

child."  Danaipour v. McLarey, 286 F.3d 1, 13-14 (5th Cir. 2002)(citations omitted).

       8.     In Article 12, the Hague Convention provides:

          Where a child has been wrongfully removed or retained in terms of Article

3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Convention art. 12. "In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing . . . [by] a preponderance of the evidence that . . . the exception[ ] set forth in article 12 . . . of the Convention applies." 42 U.S.C. § 11603(e)(2).

9.     According to the U.S. Department of State, "nothing less than *substantial evidence* of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof."  State Department Public Notice 957, 51 Fed. Reg. 10494, 10509 (March 26, 1986)(emphasis added).  Courts consider several factors to determine whether a child is settled in his or her new environment, including "the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the mother's employment, and whether the child has friends and relatives in the new area."  In re Koc, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001)(citations omitted).

10.     In Article 13, the Hague Convention states:

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that --

*a)* the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had

-25-

consented to or subsequently acquiesced in the removal or retention; or

*b)* there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

Hague Convention art. 13.  In a case for return of a child, a respondent who opposes the child's return has the burden of establishing "(A) by clear and convincing evidence that one of the exceptions set forth in article 13b . . . of the Convention applies; and (B) by a preponderance of the evidence that any other exception set forth in article . . . 13 of the Convention applies."  42 U.S.C. § 11603(e)(2).

11.   "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."   Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005)(citing Gonzalez-Caballero v. Mena, 251 F.3d 789, 794 (9th Cir. 2001)).   Both the consent and acquiescence inquiries "focus on the petitioner's subjective intent."   Baxter v. Baxter, 423 F.3d at 371.

Although the law construing the consent defense under the Convention is less developed, the defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."

Baxter v. Baxter, 423 F.3d at 371 (citation omitted).  Consent does not need to be expressed with the same degree of formality, and in examining a consent defense, a court should consider what the

-26-

petitioner actually contemplated and to what the parties agreed in allowing the child to travel outside his or her home country.  See Baxter v. Baxter, 423 F.3d at 371.  "The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention."  Baxter v. Baxter, 423 F.3d at 371 (citing Fabri v. Pritikin-Fabri, 221 F. Supp. 2d 859, 871-72 (N.D. Ill. 2001)("Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return"); Ciotola v. Fiocca, 684 N.E.2d 763, 771 (Ct. Com. Pl. 1997)(ordering return of child to Italy after petitioner allowed respondent to take child to family wedding in Ohio); Renovales v. Roosa, No. FA 91 0392232 S, 1991 WL 204483, at *1-2 (Conn. Super. Ct. Sept. 27, 1991)(ordering return of child to Spain after petitioner allowed respondent to take child to her parents' home in Connecticut for summer vacation)).

12.    The court must interpret the grave-risk exception narrowly.  See Friedrich v. Friedrich, 78 F.3d at 1068. The Tenth Circuit has not yet clearly defined the grave-risk exception. See Didur v. Viger, 197 F. App'x 749, 750 (10th Cir. 2006)("The district court denied the petition on the basis that . . . respondent . . . met his burden of establishing by clear and convincing evidence a grave risk of harm to J.D. if the child were returned to . . . Canada. . . . We need not resolve this . . . however, because a procedural error occurred that requires remand." (internal citation omitted)).

13.    Regarding this grave-risk provision of the Hague Convention, the U.S. Department of State opined:

This provision was not intended to be used by defendants as a vehicle to

-27-

litigate (or relitigate) the child's best interests.  Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination.  The person opposing the child's return must show that the risk to the child is grave, not merely serious.

A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State.  An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child.  If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition.  Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986).

14.     The United States Court of Appeals for the Sixth Circuit in <u>Friedrich v. Friedrich</u>, 78 F.3d 1060 (6th Cir. 1996), indicated that it believed "that a grave risk of harm for the purposes of the Convention can exist in only two situations."  78 F.3d at 1069.

First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute -- e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

78 F.3d at 1069.

15.     In <u>Whallon v. Lynn</u>, 230 F.3d 450 (1st Cir. 2000), the United States Court of Appeals for the First Circuit found that the exception under article 13(b) did not apply in a case involving allegations of abuse.  <u>See</u> 230 F.3d at 460.  The First Circuit noted that, in the case before it, "the alleged instances of verbal abuse of [the respondent] and her older daughter Leah, and of physical abuse of [the respondent], while regrettable, neither were directed at [the minor child] nor rose to the level of the conduct of the petitioner father in <u>Walsh[ v. Walsh</u>]," 221 F.3d 204 (1st Cir. 2000),

where the petitioner severely beat his wife over the year, including when she was pregnant, and many of the beatings took place in front of her two small children. See 230 F.3d at 460. The First Circuit noted that the respondent never alleged that the petitioner abused the minor child, either physically or psychologically, see 230 F.3d at 460. The First Circuit also addressed the respondent's argument that separation of the minor from her half-sister would cause psychological harm. See 230 F.3d at 460. The First Circuit stated:

> Whether there is a separation is Lynn's choice. She may return to Mexico with both her daughters. We do not doubt that a separation, if any, would cause difficulty. The logic, purpose, and text of the Convention all mean that such harms are not per se the type of psychological harm contemplated by the narrow exception under article 13(b). To conclude otherwise would risk substituting a best interest of the child analysis for the analysis the Convention requires.

230 F.3d at 460.

16.     A district court in the Tenth Circuit has addressed the grave risk exception in the context of allegations of abuse. See In re Hague Child Abduction Application, No. CIV. 08-2030-CM, 2008 WL 913325, at *13-14 (D. Kan. Mar. 17, 2008). The district court stated: "Even in those instances where the primary abuse has been directed at the spouse, the courts only consider whether this pattern of abuse creates a severe potential of harm to the child." In re Hague Child Abduction Application, 2008 WL 913325, at *13. The district court stated: "[C]ases that have approved invocation of the Article 13(b) exception have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse." In re Hague Child Abduction Application, 2008 WL 913325, at *13 (quoting McManus v. McManus, 354 F. Supp. 2d 62, 70 (D. Mass. 2005), citing Walsh v. Walsh, 221 F.3d at 219-220)(finding grave risk of harm where petitioner had severely beaten his wife over a number of years, including while she was pregnant, many of the beatings took place in front of her small children, and petitioner had a history of other violent

activity and of chronic disobedience of court orders), and <u>Danaipour v. McLarey</u>, 386 F.3d 289 (1st

Cir. 2004)(affirming district court finding of grave risk of psychological harm where petitioner had

sexually abused one of the two children whose return was sought)(emphasis in original).  The

district court stated that, conversely, "[e]vidence of real but <u>sporadic</u> or <u>isolated incidents of physical</u>

<u>abuse</u>, or of some limited incidents aimed at persons <u>other than the child</u> at issue, have not been

found sufficient to support application of the 'grave risk' exception."  <u>In re Hague Child Abduction</u>

<u>Application</u>, 2008 WL 913325, at *13 (emphasis in original)(citation omitted).  The district court

concluded that the record clearly established that the petitioner never hit the minor child, harmed

her in any way, or verbally abused her.  <u>See</u> <u>In re Hague Child Abduction Application</u>, 2008 WL

913325, at *14.  It stated that, at worst, the minor child witnessed her parents verbally fight and her

father attempting to control her mother.  <u>See</u> <u>In re Hague Child Abduction Application</u>, 2008 WL

913325, at *14.  It found that "any instances of physical abuse by Petitioner were limited incidents

aimed at persons <u>other than the child</u> at issue, and thus are <u>not</u> sufficient to support application of

the 'grave risk' exception."  <u>In re Hague Child Abduction Application</u>, 2008 WL 913325, at *14

(citing <u>McManus v. McManus</u>, 354 F. Supp. 2d at 70; <u>Aldinger v. Segler</u>, 263 F.Supp.2d 284, 289

(D.P.R. 2003)(finding alleged instances of abuse between the parties did not amount to a risk of

"grave harm" because they were not directed at the child nor did they have the intensity of those of

petitioner in <u>Walsh v. Walsh</u>); <u>In re D.D.</u>, 440 F. Supp. 2d 1283, 1299 (M.D. Fla. 2006)(finding "no

credible evidence that petitioner has ever physically harmed either of the two children" even though

he had been verbally abusive); <u>Giampaolo v. Erneta</u>, 390 F. Supp. 2d 1269, 1284 (D. Ga.

2004)(finding that, despite an alleged threat against the mother, "[t]here is no evidence that

Petitioner directly threatened the Child, with whom the Court is most concerned for purposes of this

determination.  More significantly, there is no evidence that Petitioner ever actually harmed

Respondent or the Child.")).  The district court thus found that returning the minor child to Mexico posed minimal, if any, grave physical or psychological risk to the child, or risk that the child would be in an intolerable situation.  See In re Hague Child Abduction Application, 2008 WL 913325, at *14.

17.     The Hague Convention states: "The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Hague Convention art. 20.  "In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing . . . by clear and convincing evidence that . . . the exception[ ] set forth in article . . .  20 of the Convention applies . . . ."  42 U.S.C. § 11603(e)(2).  "The resulting language of Article 20 has no known precedent in other international agreements to serve as a guide in its interpretation."  Public Notice 957, 51 Fed. Reg. 10494, 10511 (March 26, 1986).

> Consequently, so as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles.  Secondly, such principles must not be invoked any more frequently, nor must their invocation be more readily admissible than they would be in their application to purely internal matters.

Public Notice 957, 51 Fed. Reg. 10494, 10511 (March 26, 1986).

## II.     RELEVANT MEXICAN LAW REGARDING CUSTODY.

18.     The Civil Code for the State of Michoacan states:

> Parental authority/responsibility (*patria potestas*) over the children will be exerted: I.  By the father and mother.  II.  By the paternal grandfather and grandmother or by the maternal grandfather and grandmother, indistinctly, considering those with whom the children will have a better moral, educational, social, economical and family development.

. . . .

As long as the child is under parental authority/responsibility (*patria potestas*), he or she shall not leave the residence of those who exert it without their permission or by order emitted by an authority legally qualified to do so.

Michoacan Civil Code §§ 367, 373.

19.     The Federal Civil Code states:

Paternal authority/responsibility (*patria potestas*) is to be exerted over the children themselves as well as over their assets.   Regarding the care and education of the minors, parental authority/responsibility (*patria potestas*) is to be exerted in the manner prescribed by the order pronounced by the judge and in accordance with the Law of Social Prevision of Juvenile Delinquency of the Federal District (*Distrito Federal*).

. . . .

Parental authority/responsibility (*patria potestas*) is exerted by both parents.  When due to any circumstance one of them ceases to exert it, it shall be exerted by the other one.

. . . .

As long as the child is under parental authority/responsibility (*patria potestas*), he or she shall not leave the house of those who exert it without their permission or by means of an order emitted by an authority legally qualified to do so.

Federal Civil Code art. 413, 414, 421.

## III.     <u>RELEVANT LAW REGARDING ATTORNEYS' FEES.</u>

20.     42 U.S.C. § 11607(b) relates to "Costs incurred in civil actions."   42 U.S.C. § 11607(b).  It states:

Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

42 U.S.C. § 11607(b)(3).

-32-

## CONCLUSIONS OF LAW SPECIFIC TO THE CASE

### I.   PROCEEDINGS BEFORE THE COURT.

1.   This proceeding before the Court is for return of children under the Hague Convention.  See 42 U.S.C. § 11603(b)("Any person seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by filing a petition for the relief . . . ."); Petition at 1.

2.   At the time Quesada filed the Petition, the children were living with K. Stoner in New Mexico.  See Aug. 2, 2011 Tr. at 123:14-17 (Rosner, Quesada); id. at 125:6-9 (Rosner, Quesada); July 11, 2011 Tr. at 67:67-9 (Rosner, K. Stoner).

3.   The United States District Court for the District of New Mexico is a proper forum for Quesada's petition.  See 42 U.S.C. § 11603(a)("The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention.").

4.   The Court has jurisdiction over the petition and the parties.  See 42 U.S.C. § 11603(a), (b).

5.   The Court entered an Order to Show Cause on July 1, 2011, which ordered K. Stoner to appear before the Court with the children at a hearing, to show cause why the Court should not return the children to Mexico where a Mexican Court can make an appropriate custody determination under Mexican law, and to show cause why the Court should not grant the other relief that Quesada requested in the Petition.  See Doc. 4.

6.   The Court also entered an Order Directing that Respondent Come Before the Court With Minor Children on July 1, 2011, which ordered K. Stoner and the children to come before the Court for a hearing, and directed the United States Marshals Service to serve K. Stoner with the Court's order.  See Doc. 5.

7.     Because K. Stoner has appeared, with the children, before the Court, at two hearings, and because K. Stoner has assured the Court that she will produce the children for court hearings and to comply with court orders, the Court need not file an order directing that the children's names be entered into the N.C.I.C. missing person section.

8.     At the July 11, 2011 hearing, K. Stoner represented to the Court that she would not flee the Court's jurisdiction, that she would appear, with the children, at hearings the Court would set, and that she would obey with a court order, even one commanding her to return the children to Mexico.  Based on these representations, the Court finds it need not issue an order at this time prohibiting removal of the children from the Court's jurisdiction.

## II.     QUESADA HAS ESTABLISHED THAT THE CHILDREN WERE WRONGFULLY REMOVED OR RETAINED.

9.     Quesada has established by a preponderance of evidence that the children have been wrongfully removed or retained.  See 42 U.S.C. § 11603(e)(1); Shealy v. Shealy, 295 F.3d at 1122.

### A.     A. STONER AND V. STONER WERE HABITUAL RESIDENTS OF MEXICO.

10.     A. Stoner and V. Stoner were physically present in Mexico "for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from a child's perspective," Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995), because they were born in Mexico and, because, before their removal to the United States, they lived in Mexico and went to school there, except for a year that they spent in Los Angeles when their mother was on sabbatical.

11.     Quesada's and K. Stoner's shared intentions regarding their children during the time preceding the abduction reflected an intention to stay in Mexico, because Quesada and K. Stoner owned a house in Mexico, because they were professors at a university in Mexico, and because the children were registered to begin school in Mexico in August, 2010.  See Feder v. Evans-Feder, 63

F.3d at 224 (stating that, "Mr. and Mrs. Feder . . . both agreed to move to [Australia] . . . and did what parents intent on making a new home for themselves and their child do -- they purchased and renovated a house, pursued interests and employment, and arranged for Evan's immediate and long-term schooling," and that although "Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work").

12.     After considering the degree of settled purpose, and K. Stoner's and Quesada's shared intentions during the time preceding K. Stoner's removal of the children, the Court determines that Mexico was A. Stoner's and V. Stoner's habitual residence immediately before their removal to the United States.

13.     A. Stoner and V. Stoner were not habitually resident in the United States "immediately before the removal or retention."  Hague Convention art. 3.

**B.      THE REMOVAL OR RETENTION WAS IN BREACH OF QUESADA'S CUSTODY RIGHTS UNDER THE LAWS OF THAT STATE.**

14.     The issue of rights of custody must be addressed under Mexico law.  <u>See</u> Hague Convention art. 3 ("The rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State [in which the child was habitually resident].");  <u>Friedrich v. Friedrich</u>, 983 F.2d at 1402.

15.     While the Court need not and should not decide custody issues, <u>see</u> <u>Navani v. Shahani</u>, 496 F.3d at 129 ("The Hague Convention 'rests . . . upon the principle that any debate on the merits of . . . custody rights, should take place before . . . authorities in the State [of] the child['s] . . . habitual residence [before] its removal' because courts in th[a]t country . . . are 'in

-35-

principle best placed to decide upon questions of custody . . . .'" (citation omitted)), Quesada has

rights of custody under Mexico law pursuant to both the Mexican Federal Code and the Civil Code

for the State of Michoacan, see Altamiranda Vale v. Avila, 538 F.3d 581, 586-87 (7th Cir.

2008)("By virtue of the doctrine of *patria potestas*, Vale, the father, had rights relating to the care

of the person of the child . . . .  No more is necessary to establish that Vale had 'rights of custody,'

which Avila infringed." (citations omitted)); Federal Civil Code Article 414 ("Parental

authority/responsibility (*patria potestas*) is exerted by both parents.  When due to any circumstance

one of them ceases to exert it, it shall be exerted by the other one." ); Federal Civil Code Article 421

("As long as the child is under parental authority/responsibility (*patria potestas*), he or she shall not

leave the house of those who exert it without their permission or by means of an order emitted by

an authority legally qualified to do so."); Michoacan Civil Code § 367 ("Parental

authority/responsibility (*patria potestas*) over the children will be exerted: I.  By the father and

mother."); Michoacan Civil Code § 373 ("As long as the child is under parental

authority/responsibility (*patria potestas*), he or she shall not leave the residence of those who exert

it without their permission or by order emitted by an authority legally qualified to do so."); Federal

Civil Code Article 413 ("Paternal authority/responsibility (*patria potestas*) is to be exerted over the

children themselves as well as over their assets.").  Indeed, K. Stoner concedes that Quesada had

custody rights.  See Brief on Motion to Dismiss at 10 ("Respondent readily admits that the

beginning of a Hague Convention analysis would give the petitioner custody rights.").

16.     While K. Stoner may have been fleeing domestic violence and alcoholism, K. Stoner

did not have the right to remove the children.  See In re Hague Child Abduction Application, 2008

WL 913325, at *8 ("[T]he court finds that Petitioner had custody rights to T.A.G. under Mexican

law and that Respondent's clandestine removal of the child from Mexico without Petitioner's

approval violated these custody rights."); Federal Civil Code Article 421; Michoacan Civil Code § 373.

17.     Because it appears Quesada had rights of custody under Mexico law, and because K. Stoner did not have the right to remove the children, K. Stoner's removal of the children from Mexico, and retention of the children in the United States, was in breach of Quesada's custody rights under the laws of Mexico.

### C.     QUESADA WAS EXERCISING THESE RIGHTS OF CUSTODY AT THE TIME OF REMOVAL OR RETENTION.

18.     Although Quesada did not give K. Stoner money for supporting the children since January, 2010, he paid the mortgage of their home where he, K. Stoner, and the children lived, and throughout the children's lives Quesada and K. Stoner have provided for the children's food, shelter, and education.

19.     Quesada has not provided K. Stoner with financial support for the children since July 2010.

20.     Quesada was exercising his rights to custody at the time K. Stoner removed the children to the United States, and retained them in the United States, because he and K. Stoner lived with the children, because he participated in the children's lives, and because he helped to provide the children with food, shelter, and education.  See Friedrich v. Friedrich, 78 F.3d at 1066 ("We . . . hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.").[10]

_____

[10] K. Stoner argues that Quesada was not exercising his rights, because his contact with the children was infrequent after she took them to the United States, and because he provided no child support or financial support after she took them to the United States.  In determining whether

### D.   K. STONER'S REMOVAL AND RETENTION OF THE CHILDREN WAS WRONGFUL.

21.   Because the children were habitual residents of Mexico, because K. Stoner removed the children in breach of Quesada's rights of custody under the law of Mexico, and because Quesada was exercising his custody rights, K. Stoner's removal of the children from Mexico to the United States was wrongful.  See Hague Convention art. 3.

22.   Since wrongfully removing A. Stoner and V. Stoner, K. Stoner has retained them in the United States.

23.   The Court finds that Quesada has carried his legal burden of proof under the Hague Convention on the Civil Aspects of International Child Abduction.

## III.   K. STONER HAS NOT ESTABLISHED THAT ONE OF THE EXCEPTIONS IN THE HAGUE CONVENTION APPLIES.

24.   K. Stoner has not established that one of the exceptions in the Hague Convention applies.

### A.   THE WELL-SETTLED DEFENSE DOES NOT APPLY.

25.   The "date of wrongful removal or retention" was August 3, 2010, see Poliero v. Centenaro, No. 09-CV-2682 (RRM)(CLP), 2009 WL 2947193, at *6, 11 (E.D.N.Y. Sept. 11, 2009)(stating that the respondent agreed she would return to Italy with the children on July 1, 2009, that on July 1, 2009 she did not return to Italy, and that "the Hague Convention action was commenced well within one year of the children's wrongful retention which began on July 1, 2009, so the well-settled defense pursuant to Article 12 of the Convention does not apply to this case"),

---

Quesada was exercising his parental rights, the Court looks to whether he was exercising his custody rights "at the time of removal."  Friedrich v. Friedrich, 78 F.3d at 1063.  Evidence of, and allegations of, Quesada's actions after K. Stoner's removal of the children to the United States are thus not relevant to this inquiry.

-38-

and the "date of the commencement of the proceedings" before the Court was June 23, 2011.

26.     Because the period between the date of wrongful removal or retention, and the date of the commencement of the proceedings, is "a period of less than one year," the Hague Convention requires that "the authority concerned <u>shall</u> order the return of the child forthwith."   Hague Convention art. 12.  The well-settled defense applies only when the proceedings commenced after "the expiration of the period of one year."  Hague Convention art. 12.

27.     Even if the Petition was not brought within one year from the date of wrongful removal or retention, K. Stoner has not shown substantial evidence of the children's significant connections to the United States.

28.     Although the children have done well in school in the United States, and attend activities and church in the United States, K. Stoner and the children recently moved from Las Cruces to Kingsville where the children will attend different schools and have to make new friends. <u>See</u> <u>In re Koc</u>, 181 F. Supp. 2d at 153 (" Here Paulina has been in this country for two and a half years, since May 1998.  Yet in that same time, she has lived in at least three different locations and attended three different schools.").

29.     While the children have their mother's relatives in the United States -- grandparents, uncles, aunts, cousins, and friends -- the children had friends in Mexico, and their father is in Mexico.  <u>See</u> <u>In re Koc</u>, 181 F. Supp. 2d at 154 ("While Paulina appears to have contact with her mother's relatives here in the United States -- grandparents, aunts, uncles and cousins -- it is equally clear that she has beloved relatives in Poland as well.").  Although most of Quesada's family is in Costa Rica, he employs a housekeeper who has acted as the children's nanny for many years, and, when she is not available, the housekeeper's mother has provided assistance.

30.     Allowing the children to remain in the United States would defeat the purpose of the

Hague Convention.  See Navani v. Shahani, 496 F.3d at 1129 ("[T]he basic purpose and function of the Hague Convention and ICARA [are to ensure that] the home country should make the custody determination whenever possible." (citations omitted)(emphasis in original)); Blanc v. Morgan, 721 F. Supp. 2d 749, 765 (W.D. Tenn. 2010)(stating that, under the Hague Convention, it is of "paramount concern that courts prevent a party in a custody dispute from deriving a benefit through wrongdoing.  'In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.'" (citations omitted)).  The Court finds that, even if Quesada had not brought the Petition a year from the date of wrongful removal or retention, allowing the children to remain in the United States would not further the purpose of the Hague Convention.

### B.     QUESADA DID NOT CONSENT TO OR ACQUIESCE IN THE REMOVAL OR RETENTION OF THE CHILDREN.

31.     K. Stoner has failed to establish, by a preponderance of evidence, that Quesada acquiesced to the removal or to the retention either before or after she removed the children to the United States.  See Baxter v. Baxter, 423 F.3d at 371 ("[T]he defense of acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'").

32.     Although K. Stoner argues that Quesada acquiesced or consented in the removal of the children, because he legally abandoned the children by his failure to financially support them, K. Stoner has not directed the Court's attention to authority which states that a person can acquiesce or consent to removal through abandonment.  All the cases that the Court has found which discuss abandonment relate to whether the petitioner exercised his or her rights to custody.

33.     Quesada did not consent to the removal or retention under the convention, because although he consented to the children going on a trip to the United States, he did not consent to the children staying in the United States.   See Baxter v. Baxter, 423 F.3d at 371 (citing Fabri v. Pritikin-Fabri, 221 F.Supp.2d at 871-72 ("Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return"); Ciotola v. Fiocca, 684 N.E.2d at 771 (ordering return of child to Italy after petitioner allowed respondent to take child to family wedding in Ohio); Renovales v. Roosa, 1991 WL 204483, at *1-2 (ordering return of child to Spain after petitioner allowed respondent to take child to her parents' home in Connecticut for summer vacation).

### C.     THE CHILDREN DO NOT FACE A GRAVE RISK OF PHYSICAL OR PSYCHOLOGICAL HARM, OR AN INTOLERABLE SITUATION, IF THEY ARE RETURNED TO MEXICO.

34.     K. Stoner has not proved by clear and convincing evidence that there is a grave risk that the children will be put in an intolerable situation, or will be subject to physical or psychological harm, if they are returned to Mexico.

35.     Although Mexico is more dangerous than the United States at this time, intolerable situation was not meant to encompass return to a home where living conditions are less palatable. See Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)("A review of deliberations on the Convention reveals that 'intolerable situation' was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State.").

36.     Return to Mexico will not subject the children to psychological harm.  K. Stoner is facing criminal charges there and may go to jail if she returns, this possibility, which is unlikely, is

not clear and convincing evidence of psychological harm to the children, because the children  they may return to Mexico turn without K. Stoner.  See Whallon v. Lynn, 230 F.3d at 460 (stating that "[w]hether there is a separation is Lynn's choice[;] [s]he may return to Mexico with both her daughters," and that such psychological harm is not contemplated by the narrow exception in article 13(b) of the Hague Convention).

37.     K. Stoner has not proved by clear and convincing evidence that Quesada's drinking or abuse of her would create a grave risk that the children would be put in an intolerable situation, or would be subject to physical or psychological harm, if they are returned to Mexico.

38.     Because there is no evidence that Quesada has abused his children, and because, although Quesada can, at times, drink to excess, he is not an alcoholic and there is no evidence he has been abusive towards his children when he is drinking, there is not clear and convincing evidence that the children would be put in an intolerable situation, or subject to psychological or physical harm, if they are returned to Mexico.  See Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)("An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child."); In re Hague Child Abduction Application, 2008 WL 913325, at *13 (stating that "[c]ases that have approved invocation of the Article 13(b) exception have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse," and that, "[c]onversely, [e]vidence of real but sporadic or isolated incidents of physical abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the grave risk exception")(internal quotation marks and footnotes omitted)(emphasis in original).

39.     Although there is evidence that Quesada raped and abused K. Stoner, "any instances of physical abuse by Petitioner were limited incidents aimed at persons other than the child[ren] at

issue, and thus are <u>not</u> sufficient to support application of the 'grave risk' exception." <u>In re Hague Child Abduction Application</u>, 2008 WL 913325, at \*14 (citing <u>Aldinger v. Segler</u>, 263 F. Supp. 2d at 289 (finding alleged instances of abuse between the parties did not amount to a risk of "grave harm" because they were not directed at the child nor did they have the intensity of those of petitioner in <u>Walsh v. Walsh</u>); <u>In re D.D.</u>, 440 F. Supp. 2d at 1299 (finding "no credible evidence that petitioner has ever physically harmed either of the two children" even though he had been verbally abusive); <u>Giampaolo v. Erneta</u>, 390 F. Supp. 2d at 1284 (finding that, despite an alleged threat against the mother, "[t]here is no evidence that Petitioner directly threatened the Child, with whom the Court is most concerned for purposes of this determination.")).

40.     The Court thus finds that the grave-risk exception does not apply.

**D.     THE MATURE-CHILD EXCEPTION DOES NOT APPLY.**

41.     Although the Court may take into account a child's objection to being returned who has attained an age and degree of maturity at which it is appropriate to take into account his or her views, neither child testified at the evidentiary hearings the Court held.  The Court will not decline to order the return of the children based solely on K. Stoner's representations of the children's wishes.  While K. Stoner wanted the Court to hear from A. Stoner and V. Stoner in chambers, Quesada was opposed to such a procedure.  Neither parent wanted the children to testify.  The Court was reluctant to hear from the children except in open court, else that procedure could deny Quesada of due process and opportunity to cross examine the children.  Neither A. Stoner nor V. Stoner attempted to contact the Court, by letter or otherwise, to express their wishes.  The age of the girls and their failure to make any effort to contact the Court, as well as the other facts and circumstances of the case, suggest that neither girl is sufficiently mature to make an objection that the Court should recognize.

### E.    THE PUBLIC POLICY EXCEPTION DOES NOT APPLY.

42.    Refusal to return the children would not violate fundamental principles relating to the protection of human rights and fundamental freedoms.  See Brief on Motion to Dismiss at 28 ("Research on this last defense renders it not applicable to this case.").

43.    Neither party points to a fundamental public policy of the United States that would be violated if the Court orders the daughters' return to Mexico.  Instead, the public policy of the United States appears to be to be well expressed in the Hague Convention.

## V.    THE COURT ORDERS K. STONER TO RETURN THE CHILDREN TO MEXICO.

44.    Mexico should address the custody issues, and the time, manner, and circumstances under which A. Stoner and V. Stoner should have contact with Quesada.  See Navani v. Shahani, 496 F.3d at 1129 ("[T]he basic purpose and function of the Hague Convention and ICARA [are to ensure that] the home country should make the custody determination whenever possible." (citations omitted)(emphasis in original)).

45.    The Family Law Court in the Third Judicial District Court, Dona Ana County, New Mexico, should not address the custody issues, or the time, manner, and circumstances under which A. Stoner and V. Stoner should have contact with Quesada.  See Navani v. Shahani, 496 F.3d at 1129.

46.    The Court will grant the return of A. Stoner and V. Stoner under the Provisions of Article 12 of the Hague Convention on the Civil Aspect of International Child Abduction.

47.    The Court orders K. Stoner to return A. Stoner and V. Stoner to Mexico.  K. Stoner can choose whether she wishes to accompany the children.

48.    The Court will grant Quesada's request in his Petition that the Court order the children returned to Mexico.

## VI.   THE COURT ORDERS K. STONER TO PAY AVENDANO'S ATTORNEYS' FEES AND COSTS.

49.     The Court orders K. Stoner to "pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child."  42 U.S.C. § 11607(b)(3).

50.     To determine attorneys' fees, the Court multiplies "the number of reasonable hours expended by a reasonable hourly rate."  Neves v. Neves, 637 F. Supp. 322, 339-40 (W.D.N.C. 2009)("In determining the amount of reasonable attorney's fees to award under ICARA, federal courts typically apply the lodestar method.  Under the lodestar method, the Court multiplies the number of reasonable hours expended by a reasonable hourly rate." (citing Wasniewski v. Grzelak–Johannsen, 549 F. Supp. 2d 965, 971 n.5 (N.D. Ohio 2008); Distler v. Distler, 26 F. Supp. 2d 723, 727 (D.N.J. 1998); Freier v. Freier, 985 F. Supp. 710, 712 (E.D. Mich. 1997); Berendsen v. Nichols, 938 F. Supp. 737, 738 (D. Kan. 1996); Flynn v. Borders, No. 5:06–323–JMH, 2007 WL 862548, at *2 (E.D. Ky. Mar. 20, 2007); Friedrich v. Thompson, No. 1:99–CV–772, 1999 WL 33951234, at *3 (M.D.N.C. Nov. 26, 1999)).

51.     Quesada has filed an affidavit for attorneys' fees and costs.  See Affidavit, filed August 3, 2011 (Doc. 25).

52.     Quesada's attorney, Shane English, represents that his hourly rate was $160.00 per hour until May 31, 2010 and $180.00 per hour thereafter.  See Affidavit ¶ 3, at 1.  K. Stoner did not object to Mr. English's hourly rate.

53.     The Court finds that this hourly rate is reasonable for federal court practice in the District of New Mexico.  See Mountain Highlands, LLC v. Hendricks, No. Civ 08-0239 JB/ACT, 2010 WL 1631856, at *9-10 (D.N.M. Apr. 2, 2010)(Browning, J.)(approving an hourly rate of

$170.00 to $210.00 for commercial litigation); <u>Wiatt v. State Farm Ins. Cos.</u>, No. CIV 07-0526 JB/KBM, 2008 WL 2229630, at *4-5 (D.N.M. Mar. 24, 2008)(Browning, J.)(holding that a fee of $200.00 per hour for insurance defense work was reasonable); <u>Applied Capital, Inc. v. Gibson</u>, No. CIV-05-0098 JB/ACT, 2007 WL 709054 at *3 (D.N.M. Jan. 30, 2007)(Browning, J.)(approving hourly rate of $210.00 for commercial-litigation dispute); <u>Allahverdi v. Regents of Univ. of N.M.</u>, No. CIV05-0277 JB/DJS, 2006 WL 1304874 at *2 (D.N.M. Apr. 25, 2006)(Browning, J.)(finding hourly rate of $225.00 reasonable); <u>Kelley v. City of Albuquerque</u>, No. CIV 03-507 JB/ACT, 2005 WL 3663515, at **15-17 (Doc. 117)(D.N.M. Oct. 24, 2005)(Browning, J.)(finding $250.00 per hour to be a reasonable rate). While the Court does not get many family law cases in federal court, its experience within the Albuquerque region is that often times the family lawyers charge more than even top commercial litigators. And therefore, the Court finds that these two rates are reasonable both for commercial litigation within the district, § 1983 litigation within the district, and from the Court's experience, for family law lawyers in the Albuquerque area and the State of New Mexico.

54.     Mr. English states that he spent 19.6 hours on the case on May 31, 2011, 18.5 hours on June 25, 2011, 18.6 hours on July 11, 2011, and 28.1 hours on August 2, 2011. <u>See</u> Affidavit, Attachment A.

55.     The Court believes that the entry of 28.1 hours was a typographical error[11] and that Mr. English meant to enter 18.1 hours. It appears that Mr. English was working 18 and 19 hour days. With this correction to the number of hours Mr. English worked on this matter, Quesada's attorneys' fees and costs amount to $14,581.72. K. Stoner did not object to the amount Quesada was seeking, only to the award of attorneys' fees and costs in Quesada's favor. The Court thus orders

---

[11] The Court notes that there are only twenty-four hours in a day, and Quesada's attorney provides the rate for only one attorney, which indicates that only one lawyer worked on the case.

K. Stoner to pay Quesada's attorneys' fees and costs in the amount of $14,581.72, and transportation costs related to the return of the children.

**IT IS ORDERED** that (i) the Verified Petition for Return of Children to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent, filed June 23, 2011 (Doc. 2), is granted in part and denied in part; (ii) the Defendant's Motion to Dismiss Verified Petition for Return of Children to Petitioner Because the Hague Convention is Not Applicable and Custody Litigation is in the United States, Third Judicial District Court County of Dona Ana, State of New Mexico, filed July 7, 2011 (Doc. 11), is denied; (iii) the Court will not file an order directing that the names of the children be entered into the national police computer system; (iv) the Court has ordered Respondent Kathryn Elizabeth Stoner Smith to appear before the Court; (v) the Court will not issue an immediate order prohibiting removal of the children from the Court's jurisdiction; (vi) the Court has ordered K. Stoner to appear before to Court to show cause why the children should not be returned to Mexico; (vii) the Court grants Petitioner Mauricio Ricardo Quesada Avendano's petition for return of Alejandra Quesada Stoner and Victoria Quesada Stoner to Mexico; and (viii) the Court orders K. Stoner to pay Quesada's court costs, legal fees, and transportation costs related to the return of the children.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Shane A. English
Keithly & English, LLC
Anthony, New Mexico

*Attorneys for the Petitioner*

-47-

Mary W. Rosner
Rosner Family Law Center
Las Cruces, New Mexico

*Attorney for the Respondent*